IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH POPE, JR., | ) | CASE NO. 3:15CV590 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| JOHN COLEMAN, | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Kenneth Pope, Jr. ("Petitioner" or "Pope") brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Doc. 1, 11. Pope is detained at the Toledo Correctional Institution, having been convicted by a Montgomery County, Ohio, Court of Common pleas jury of four counts of murder with firearm specifications and having pleaded guilty to one count of having weapons under a disability. Doc. 9-2, p 34.[1]  *State v. Pope*, No. 2009 CR 02683/02 (Montgomery Cty. Common Pleas Ct. filed August 1, 2012). On August 1, 2012, the trial court merged counts one and two and counts three and four and sentenced Pope to 15 years in prison on each count and three years on each of the firearm specifications, to be served concurrently, for an aggregate sentence of 36 years to life in prison. Doc. 9-2, pp. 34-36.

On September 15, 2015, Pope filed an Amended Petition for Writ of Habeas Corpus setting forth one ground for relief. Doc. 11. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. As set forth

---

[1] Doc. page citations are to ECF Doc. page numbers.

more fully below, the undersigned recommends that Pope's Amended Petition for Writ of Habeas Corpus (Doc. 11) be **DISMISSED** in part and **DENIED** in part.[2]

# I. Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

## A. State Court Action

### 1. Underlying Facts

The following summary of underlying facts is taken from the opinion of the Montgomery County Court of Appeals, Second Appellate District of Ohio:[3]

> {¶ 4} This case arose from the murders of Gerald Brown and Dennis Glover on March 17, 2009. At the time, Brown lived at 515 North Broadway, Dayton, Ohio, in an admitted "dope house," where drugs, including crack cocaine, were sold and consumed. The house had two entrances—a front door that sellers were permitted to use, and a side door, where customers came to purchase drugs. The side entrance had stairs leading down to a basement, and stairs that led up to the main floor. Customers were allowed into the basement to use drugs.

> {¶ 5} Both doors were generally locked, and a doorman was stationed at each door. The front doorman looked out the window, watching for the police and to see who was out front. The side doorman answered the door and admitted customers. Brown also had two "house guns" that were used for protection.

> {¶ 6} The people who normally sold drugs from the house were Gerald Brown, Dennis Glover, Levar Stinson, Kenneth Pope, Terrence Snowden, Sammie Jones, and Jermaine Maddox. Jones lived at the house and additionally acted as a doorman. Another individual, Sherrone Cord, also acted as a doorman.

---

[2] The portion of the ground in the petition that is procedurally defaulted results in dismissal; the portion of the ground in the petition that is addressed on the merits results in denial.

[3] Pope has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

{¶ 7} On the day of the murders, Defendant, Kenneth Pope, arrived at the house at around 10:15 a.m. Pope had parked his car down the street, because he did not think it was a smart idea to park in front of the dope house.

{¶ 8} Pope was a part-time drug dealer, and made between $300 and $1,000 per week selling drugs while attending college. The other accused killer, Terrence Snowden, was not related to Pope, but was a cousin of Pope's half-brother, Kenneth Snowden. Gerald Brown was a close friend of Kenneth Snowden's family.

{¶ 9} Levar Stinson arrived at the house at 11:00 or 12:00 p.m. When Stinson arrived, Pope, Maddox, Cord, Jones, and Brown, were there, as well as Stinson's cousin, Mark. Everyone other than Jones was on the main level. Jones was down in the basement with two customers, Sara and Tracy.

{¶ 10} Snowden eventually arrived at around 2:30 p.m. Before Snowden arrived, Mark was sent out to get a gun. After Mark left, Stinson and Glover were sitting talking in a back room. When they came out, Pope was holding a house gun on Brown, stating that he "finally" got the gun. According to Stinson, Pope was mad about money issues and about not being able to get the gun when he wanted it. Pope was also upset because Stinson was selling dope out of the house and only a limited number of customers were available for the sellers.

{¶ 11} Stinson talked to Pope and finally got him to put the gun away. Pope kept the gun, but everyone sat and "chilled." Although Pope was on his cell phone, Stinson was not really paying attention to Pope because he thought the incident was over.

{¶ 12} Around this time, Jones came upstairs and was sent out to purchase more drugs, because there were no drugs left to sell. Jones then left the house, and saw Snowden coming in through the front door. After Snowden arrived, the argument escalated. Snowden was mad because people were making more money than he was selling dope out of the house. In particular, Snowden was angry because Glover was making more money than he was. Snowden stated that if he couldn't make any money in there, no one would make any money, that the house would be leveled to a parking lot. Snowden smacked Brown in the face, told him he was sick of his sh*t and that Brown was not his "cousin" anymore.[] Snowden indicated that when he said he was going to rob the "spot" (referring to the drug house), he was not talking about robbing Brown, but would now rob Brown since Brown was no longer his "cousin."

{¶ 13} Shortly thereafter, Pope signaled Glover to come with him to Brown's bedroom. When they came back to the living room, Snowden asked Pope what he had gotten. Pope threw some money on the table in the living room. Stinson then began yelling at Glover, asking if he had just been robbed.

{¶ 14} At this point, Snowden held out a gun and told Stinson, Glover, and Brown to strip. Pope also had a gun out and was covering with it. Stinson, Glover, and Brown were being moved toward a corner of the room.

{¶ 15} Sensing trouble, Cord tried to leave, but Snowden and Pope stopped him by the front door. They pushed the door closed, grabbed Cord by the arm, and pulled him back into the living area. In an angry tone, Pope said that Cord was not going anywhere. Pope then hit Cord in the back of the head, and Cord fell to the ground. He was still conscious and could hear, but he could not see anything.

{¶ 16} Almost immediately after Cord fell, Stinson heard a shot. Both Pope and Snowden pointed their guns and shot. Stinson grabbed a gun and shot back. When the first exchange of fire occurred, Stinson grabbed Glover and started running for the window in the back of the house. However, Glover had seen Brown get shot, and wanted to help Brown. Stinson exchanged fire again with Pope and Snowden, and this time, Glover was hit. When Glover was hit, he spun around. Brown landed next to Glover and on top of Stinson. At this point, Stinson heard Pope and Snowden whispering. They walked toward Stinson, and he closed his eyes and acted like he was dead. Stinson heard Pope ask if they were dead. Stinson then heard Pope and Snowden run for the stairs by the basement. Stinson threw Brown off and jumped out the bathroom window. By this time, Cord was at the side window and helped Stinson up. As they came around the house, Stinson saw Pope and Snowden coming around the left-hand side of the house, running together. Pope and Snowden ran across the street, passed a barber shop, and kept running. In the meantime, the two women who had been in the basement also ran away from the house.

{¶ 17} Jones returned to the house, discovered the injured men, and called 911. When the police arrived, they found Jones sitting on a couch, sobbing. One man was alive and was trying to get up, while the other had a clear gunshot wound to the head, but appeared to be alive. Ultimately, Brown died as the result of a gunshot wound to the abdomen, and Glover died as a result of a gunshot wound behind his right ear.

{¶ 18} The police interviewed Jones and Cord on the day of the crime, and Cord identified Snowden and Pope from photo spreads. No firearms were recovered from the scene.

{¶ 19} The day after the crime, Pope met with an attorney, and then voluntarily came with his lawyer to the Dayton Safety Building for an interview. Initially, Pope told the police that he had been visiting Brown, who was a good friend. Pope claimed that his stepbrother, Terrence Snowden, showed up around 2:00 p.m., was all "hyped up," and was arguing with Brown. Pope denied having a gun, and stated that he did not know why Snowden was upset with Brown. He also said that when he tried to leave, Cord stopped him at the front door of the house. Cord grabbed him and asked where he was going. Pope responded by punching Cord. When he did so, he heard multiple gunshots, but did not know who was shooting. As a result, Pope crawled down the hallway to a weight room and dove through a window to escape. After running into Snowden outside the house, he and Snowden went to his car. Pope dropped Snowden off at the house of his brother, who was related to Snowden.

{¶ 20} After the police confronted Pope with the fact that witnesses had seen him with a gun, Pope admitted that he had a gun. Pope then said he had been handed the "house gun," a .22 long revolver, around noon. Pope also stated that when he tried to leave, he

picked up the house gun, which was on a green chair by the front door, and hit Cord in the head. Otherwise, Pope's story remained the same.

{¶ 21} Pope claimed that he had broken the glass of the window when he dove through it, and had received some abrasions and injuries. The police took pictures of Pope's injuries, which showed abrasions or cut marks on the right arm, left arm, and chest area, a laceration to the chin, and abrasions to the shin. Pope also told the police that Stinson had fired shots first.

{¶ 22} When the police told Pope that it was important to obtain the gun to check it against the evidence at the scene, Pope and his attorney left to get the gun. When they returned, the building was closed, and the officer with whom they had been speaking had left for the day. Pope's attorney then gave a long .22 nine-shot revolver to the police. This gun was operable, but none of the bullets or bullet fragments from the crime scene matched the gun. There were also glass fragments stuck in the butt of the gun, which could have been caused by the gun having been used to break a window.

{¶ 23} Stinson did not talk to the police until June 2009, when his parole officer put out a capias warrant because the police wanted to talk to him. Stinson claimed that he was afraid to talk with police because he had been receiving threats, and also was on parole. Stinson identified Pope and Snowden, and told police that he had seen Snowden shoot Brown. He also said that he saw Pope shooting.

{¶ 24} Snowden was indicted in December 2011 on four counts of Murder, with firearm specifications, and one count of Having a Weapon Under Disability, in connection with the deaths of Brown and Glover. Pope took the stand at trial, and testified to a third version of events. At trial, Pope claimed that he had initially lied about the gun because he was on parole and wanted to avoid going back to prison. He told basically the same story about the events leading up to the shooting. However, with respect to his actions shortly before the shooting, he claimed that he had gone to the side door to handle a customer because Snowden was arguing with everyone. Cord opened the door, and the customer began complaining that Cord had been skimming dope. Pope stated that he made things right with the customer, but then began arguing with Cord at the side door. Pope told Cord that he did not want him to work the door anymore. Pope then hit Cord with a gun while they were on the stairs by the side door. This would have placed Pope out of the vicinity of the living room, where the shootings occurred.

{¶ 25} Pope testified that Cord fell down on the steps when he hit him, and that he (Pope) immediately heard shots. Instead of going out the side door to get away, Pope claimed that he crawled down the hallway to the back because he knew people were shooting and he thought it was safer to go out the back. As before, he indicated that he broke the window with the butt of the gun, and jumped out the window. He stated that as soon as he got out of the house, he started running for his car, and met up with Snowden, who followed him to his car. There was blood on Snowden's shirt and Snowden thought he had been shot. Snowden was hysterical and kept saying that Var (Levar Stinson) had shot him. Snowden discovered on the way to Pope's brother's house that he had not been shot,

and Pope dropped him off at the house. Pope then consulted an attorney and went to the police the next day.

{¶ 26} Following a jury trial, Pope was convicted on all charges, other than the Having Weapons Under Disability charge, to which he had previously pled guilty. Pope was sentenced as indicated above, and appeals from his conviction and sentence.

*State v. Pope*, 2013 WL 5914990, at *1-4 (Oh. Ct. App. Nov. 1, 2013).

## 2. Procedural History

On December 13, 2011, a Montgomery County Grand Jury indicted Pope on four counts of murder, each with a firearm specification, and one count of having a weapon while under a disability. Doc. 9-2, pp. 1-5. Pope pleaded not guilty to all counts. Doc. 9-2, p. 7.

Prior to trial, Pope, through counsel, filed two motions to suppress evidence and requested an evidentiary hearing. Doc. 9-2, pp. 8-13. The trial court held a hearing on the motions and denied them. Doc. 9-2, pp. 14-19. The case proceeded to trial. During voir dire, Pope pleaded guilty to having a weapon while under a disability. Docs. 9-2, pp. 20-21; 9-3, pp. 120-121. On July 13, 2012, the jury found Pope guilty on all counts. Doc. 9-2, pp. 22-33.

On August 1, 2012, the trial court merged counts one and two and counts three and four, sentenced Pope to 15 years in prison on each count and three years on each of the firearm specifications, to be served concurrently, for an aggregate sentence of 36 year to life in prison. Doc. 9-2, pp. 34-36.

## B. Direct Appeal

On August 7, 2012, Pope, through two different attorneys, filed two appeals with the Montgomery County Court of Appeals. Doc. 9-2, pp. 37-38. One appeal was filed by his trial counsel; the other appeal was filed by new counsel. Doc. 9-2, pp. 8, 37-38. The Ohio Court of Appeals found Pope's two appeals to be duplicative and, *sua sponte*, dismissed the appeal filed by his trial counsel. Doc. 9-2, pp. 39-40.

In his brief, Pope set forth the following assignments of error:

1. Mr. Pope's conviction is against the manifest weight of the evidence.

2. The evidence presented by the State was insufficient to convict Mr. Pope.

3. The Trial Court erred by sentencing Mr. Pope to consecutive sentences.

4. Mr. Pope's due process rights were violated due to cumulative errors committed throughout his trial.

    A. Mr. Pope was provided with ineffective assistance of counsel.
    B. The Prosecutors committed prosecutorial misconduct.
    C. Mr. Pope did not expressly waive his Fifth Amendment right against self-incrimination at the trial.

Doc. 9-2, pp. 42, 54-57. On November 1, 2013, the Ohio Court of Appeals affirmed in part and reversed in part, remanding the case to the trial court "for the sole purpose of giving the trial court the opportunity to make the requisite findings for imposing consecutive sentences under R. C. 2929.14(C)." Doc. 9-2, p. 103.

**C. Ohio Supreme Court**

On December 9, 2013, Pope, *pro se*, appealed to the Ohio Supreme Court. Doc. 9-2, p. 106. In his memorandum in support of jurisdiction, he asserted the following propositions of law:

1. The evidence presented by the State was insufficient to convict Mr. Pope.

2. Mr. Pope's due process rights were violated due to cumulative errors committed throughout his trial.

Doc. 9-2, p. 109. On March 26, 2014, the Ohio Supreme Court declined to accept jurisdiction. Doc. 9-2, p. 150.

**D. Federal Habeas Petition**

On March 25, 2015, Pope, through counsel, filed a federal Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. Doc. 1. He filed an Amended Petition on September 3, 2015, and listed the following ground for relief:

> The State failed to produce sufficient evidence to convict Pope of Murder and the Gun Specifications.
>
> > **Supporting Facts:** Regarding the Murder conviction, the Ohio Court of Appeals held that there was sufficient evidence to convict Pope of either Murder or Complicity to Murder, but failed to identify or apply the distinct elements for Complicity to Murder to the facts. Had it done so, even construing the record facts to favor the State, there was insufficient evidence that Pope caused the deaths using a gun, and insufficient evidence that he possessed the requisite mens rea for Complicity to Murder.
> >
> > Regarding the Gun Specifications, the Ohio Court of Appeals failed to state whether Pope was convicted as a principal or a complicitor, and failed to address whether Ohio law actually states an offense for complicity to a gun specification. Under Ohio law, a defendant can be complicit for another's offense. But a gun specification is a sentencing enhancement and not an offense. Thus, there was insufficient evidence that Pope used or brandished the gun for principal liability on the record facts; and insufficient evidence for complicity liability because complicity to a gun specification is not an Ohio offense.

Doc. 11, p. 2. On November 3, 2015, Respondent filed a Return of Writ (Doc. 13). Pope filed a Traverse (Doc. 16) and Respondent filed a reply (Doc. 17). Respondent argues that the first portion of Pope's ground for relief fails on the merits and that the second portion is procedurally defaulted and not cognizable. Doc. 13, pp. 13-23.

## II. Law

### A. Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to Pope's habeas petition because he filed it after the effective date of AEDPA. 28 U.S.C. § 2254; *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). Under AEDPA, a petitioner must meet certain procedural requirements in order to have his claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430

(6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). In contrast, when state court remedies are no longer available, procedural default rather than exhaustion applies. *Williams*, 460 F.3d at 806.

**Exhaustion.** A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts"). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues

arising under state law. *See, e.g.,* *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees,* 822 F.2d 1418, 1421 (6th Cir. 1987).

**Procedural Default.** Procedural default may occur in two ways. *Williams,* 460 F.3d at 806. First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* In *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also* *Williams,* 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin,* 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams,* 460 F.3d at 806 (citing *O'Sullivan,* 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.* While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see* *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state

courts constitutes a procedural default of those claims that bars federal court review.  *Williams, 460 F.3d at 806*.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.

**Merits Review**.  In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause).  *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id. at 413*.  "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principals and standards flowing from Supreme Court precedent.  *Id*. at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005).  If the Supreme Court has not addressed the

11

petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

Pope sets forth one ground for relief in his Amended Petition. Doc. 11, p. 2. Respondent argues that the first portion of Pope's ground for relief fails on the merits and that the second portion is procedurally defaulted and not cognizable. Doc. 13, pp. 13-23. For convenience, the undersigned considers Pope's portions of his ground for relief in reverse order.

#### A. The second portion of Pope's ground is procedurally defaulted

In the second portion of his ground for relief, Pope argues that there was insufficient evidence that he used or brandished the gun for principal liability and complicity liability. Doc. 11, p. 2. Respondent contends that this claim is procedurally defaulted because Pope did not present this claim to the Ohio courts; he may no longer do so because it is based on the trial court record and Ohio law requires him to raise it on direct appeal; and that he cannot show cause or prejudice to excuse his procedural default. Doc. 13, pp. 14-17.

Pope did not present his claim to the Ohio courts.  The undersigned agrees that he may no longer do so because it is based on the trial court record and Ohio law requires him to raise it on direct appeal.  *See Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (citing *State v. Lentz*, 639 N.E.2d 784, 785 (1994)).  In his Traverse, Pope concedes that he did not present the second portion of his ground for relief to the state court and agrees it is exhausted.  Doc. 16, pp. 2-3. Pope does not allege cause, prejudice, or manifest injustice to excuse the default.  Accordingly, the second portion of Pope's ground for relief is procedurally defaulted.  *See Williams*, 460 F.3d at 806 (a claim is procedurally defaulted when a petitioner failed to raise it in state court and pursue it through the state's ordinary appellate review procedures and state law no longer permits the petitioner to raise the claim); *O'Sullivan*, 526 U.S. at 848.

### B. The first portion of Pope's ground fails on the merits

In the first portion of his ground for relief, Pope argues that there was insufficient evidence at trial that he (1) "caused the deaths using a gun" and (2) "possessed the requisite mens rea for Complicity to Murder."  Doc. 11, p. 2.

On federal habeas review, a state court's determination regarding a sufficiency of evidence claim is entitled to a "double layer" of deference.  *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  The first layer of deference goes to the factfinder; the second goes to the state reviewing court as required by AEDPA.  *Id.*  Deference is due to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts."  *Jackson*, 443

at 319. The standard is not whether the trier of fact made the correct guilt or innocence determination but, rather, whether it made a rational decision to convict or acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). In making this determination, a court does not reweigh the evidence or redetermine the credibility of the witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

The second layer of deference goes to the state appellate court. Even if a review of the evidence were to lead to the conclusion that a rational trier of fact could not have found guilt beyond a reasonable doubt, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009); *Coleman v. Johnson*, — U.S. —, 132 S.Ct. 2060, 2062 (2012) (reaffirming that sufficiency of the evidence claims under *Jackson* "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference").

On direct appeal, Pope asserted a claim that his conviction was against the manifest weight of the evidence and that it was not supported by sufficient evidence. The Ohio Court of Appeals first considered Pope's claim regarding manifest weight of the evidence and then based its analysis of Pope's sufficiency claim on the results of its manifest weight determination:

> {¶ 31} The jury was charged that Pope could be held responsible for the murders either as a principal offender or as an aider and abettor. With respect to aiding and abetting, R.C. 2923.03(A) provides that "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense * * *."

14

{¶ 32} Aiding and abetting means that "the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). In *Johnson*, the court also agreed with the proposition that "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id.*, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 33} According to Stinson's testimony, Pope and Snowden were both upset about the fact that they were not making more money at the drug house. Snowden indicated that he intended to rob the house, and Pope actually went into another room and obtained money from Glover. Pope struck and injured one person to prevent him from leaving, and, according to Stinson, held the victims at gunpoint and participated in the shoot-out. In addition, Pope and Snowden were seen leaving the scene together. Pope also drove the gunman to his brother's house, and, thus, assisted in his getaway.

{¶ 34} Although Pope denied being involved, he told several versions of his story, and his testimony at trial lacked credibility under standards relating to manifest weight and the appellate court's duty to review the entire record and consider witness credibility. Accordingly, the conviction is not against the manifest weight of the evidence.

\*       \*       \*

{¶ 39} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP–881, 2011–Ohio–3161, ¶ 11. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP–725, 2005–Ohio–2198, ¶ 15.

{¶ 40} We have already concluded that Pope's conviction is supported by the weight of the evidence. Therefore, under the reasoning expressed above, the conviction is also supported by sufficient evidence.

*Pope*, 2013 WL 5914990, at \*5-6.

The jury heard evidence that, after a verbal disagreement in a drug house among drug dealers operating out of the house regarding the amount of money each was making, Snowden declared that he would rob the house; Snowden then held out a gun and told Stinson, Glover and Brown to strip; Pope "had a gun out" and was "covering" Snowden with it; Pope and Snowden

stopped Cord when Cord tried to leave by pushing the door closed and pulling Cord by his arm back into the living room; Pope told Cord he was "not going anywhere" and hit him on the back of the head; a shot was heard; Pope and Snowden pointed their guns and shot; a gunfight ensued between Pope and Snowden on one side and Stinson, who had since grabbed a gun of his own, on the other; Brown and Glover were shot; Stinson, now lying on the floor pretending to be dead, heard Pope ask if "they" were dead; Pope and Snowden fled; and, thereafter, Pope drove Snowden to his brother's house. Viewing the trial testimony and exhibits in the light most favorable to the prosecution, a rational trier of fact could have found that Pope committed the essential elements of the crime—that he aided and abetted Snowden—beyond a reasonable doubt. *See Jackson*, 443 at 319. Thus, whether or not Pope "caused the deaths using a gun," i.e., whether he fired the shots that killed Brown and Glover, is immaterial to Pope's conviction for complicity.

Moreover, the Ohio Court of Appeals' determination is not unreasonable; therefore, the Court must defer to it. *See Brown*, 567 F.3d at 205. In his Petition, Pope states, without explanation, "[the Ohio Court of Appeals] failed to identify or apply the distinct elements for Complicity to Murder to the facts." Doc. 11, p. 2. The undersigned disagrees; the state Court of Appeals set forth what conduct constitutes aiding and abetting and recited the facts showing Pope aided and abetted. *Pope*, 2013 WL 5914990, at *5.

In his Traverse, Pope asserts, for the first time, that Ohio law "is unsettled with no controlling precedent" relevant to the mens rea requirement of complicity. Doc. 16, p. 2. He complains that the Ohio Court of Appeals, in the absence of controlling precedent, "failed to elaborate on whether [the aiding and abetting] intent modified the act, the facilitation, or both." Doc. 16, p. 3. He criticizes the Ohio Court of Appeals for not discussing "foreknowledge," a standard allegedly announced by a recent United States Supreme Court case, *Rosemond v.*

16

*United States*, —U.S.—, 134 S.Ct. 1240 (2014). Doc. 16, p. 3. He states that, based on *Rosemond*, the Ohio Supreme Court "must clarify the mens-rea elements for a complicity offence" and that this Court, thereafter, "must likewise evaluate Pope's sufficiency claim applying Ohio's actual complicity elements, not erroneous ones," pursuant to the rule announced by another recent United States Supreme Court case, *Musacchio v. United States,* 136 S.Ct. 709 (2016). Doc. 16, p. 3. In order for the Ohio Supreme Court to "clarify" the mens rea elements for complicity offenses in light of this recent Supreme Court precedent, Pope requests that the Court certify a state law question to the Ohio Supreme Court. Doc. 16, p. 4.

Pope's arguments fail. First, a court is not required to address a theory of relief asserted only in a traverse but not in the habeas petition. *See Tyler v. Mitchell,* 416 F.3d 500, 504 (6th Cir. 2005). Second, Pope's arguments are premised upon case law decided after Pope's conviction and appeals. As explained by the United States Supreme Court in *Greene v. Fisher*,

> [W]e held last Term, in *Cullen v. Pinholster*, 563 U.S. ———, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id*., at ———, 131 S.Ct., at 1398. The reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions "against this Court's precedents *as of 'the time the state court renders its decision*.'" *Id*., at ———, 131 S.Ct., at 1399 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); emphasis added).

132 S.Ct. 38, 44 (2011). Thus, this Court may not consider United States Supreme Court decisions issued in 2014 and 2016 when measuring the Ohio Court of Appeals' decision in November 2013 in Pope's case. And, Ohio law being allegedly "unsettled" on the issue, the Ohio Court of Appeals' interpretation of state law, including one announced on direct appeal of

Pope's conviction, binds a federal habeas court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2006).[4]

Accordingly, the first portion of Pope's ground for relief fails on the merits.

## IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Petitioner's habeas Petition be **DENIED** insofar as the first portion of his ground for relief fails on the merits and **DISMISSED** insofar as the second portion of his ground for relief is procedurally defaulted.

Dated: February 23, 2016

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[4] In his Traverse, Pope takes issue with the jury instructions that were given by the trial court. Doc. 16, p. 2. Any challenge to the jury instructions is procedurally defaulted because Pope never raised this issue on direct appeal, as he was required to do. *See Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (issues based on the trial court record are required to be raised on direct appeal).